**Clarence Allen HOLT, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. A08–223.**

Supreme Court of Minnesota.

Sept. 3, 2009.

Rehearing Denied Oct. 6, 2009.

Theodora Gaitas, Assistant State Public Defender, St. Paul, Minnesota, for appellant.

Lori Swanson, Attorney General, St. Paul, Minnesota; and James C. Backstrom, Dakota County Attorney, Cheri A. Townsend, Assistant Dakota County Attorney, Hastings, Minnesota, for respondent.

## OPINION

MEYER, Justice.

A Dakota County jury found Clarence Holt guilty of first-degree premeditated murder, second-degree intentional murder, and second-degree murder while committing or attempting to commit the felony offense of assault in the second degree, for the May 13, 1997, shooting death of Frederick Pitts. The district court sentenced Holt to life in prison for first-degree premeditated murder. Nine years later, Holt filed a petition for postconviction relief in Dakota County District Court but did not request an evidentiary hearing. Holt appeals the district court's denial of his petition. The following seven issues are raised: (1) whether Holt's appeal is barred by his delay in seeking postconviction relief; (2) whether the district court erred by not removing a juror who had been the victim of a crime during the trial and who could not say with certainty that the crime was unrelated to Holt's case; (3) whether Holt's exclusion from an in-chambers *Schwartz* hearing violated his constitutional right to self-representation; (4) whether Holt's exclusion from an in-chambers *Schwartz* hearing violated his constitutional right to be present at critical stages of the proceeding; (5) whether the district court erred by admitting evidence of Holt's witness tampering and failing to instruct the jury on the specific purpose of "consciousness of guilt" evidence; (6) whether the district court erred by admitting an alleged accomplice's statements as substantive evidence; and (7) whether the district court erred by refusing to give an accomplice liability instruction. We affirm the conviction.[1]

Fredrick Pitts was killed at the Red Roof Inn in Burnsville just before 7:45 p.m. on Wednesday, May 13, 1997. He died from a gunshot fired from within an inch of his head. Holt was soon identified as the primary suspect, but evaded arrest until August 6, 1997.

Holt was charged by indictment with first-degree premeditated murder, second-degree intentional murder, and second-degree murder while committing or attempting to commit the felony offense of assault in the second degree.

Evidence at trial revealed a drug-selling relationship gone awry. Pitts had lived in Minnesota for two weeks prior to his murder. During that time, James Turner (a/k/a June) fronted money to Pitts to buy crack cocaine, and Pitts gave the crack to Holt to sell. After Holt failed to produce sufficient profits, Turner told Pitts to stop doing business with Holt. The day before the murder, Pitts and Turner visited Holt and asked Holt why he was short on money. Holt gave them an estimated $1,600, which the two men divided; however, they still felt Holt was being dishonest.

The day of the shooting, Holt moved into David McCoy's apartment. In exchange, McCoy asked for crack cocaine. Holt called 16–year–old Marqueen Hamer (a/k/a Queen), who sold crack cocaine for him, and asked her, as he had in the past, to have Pitts call him. Queen called the Red Roof Inn where Pitts was staying and left a message with Domino, Pitts' girlfriend. Pitts returned the call to Queen between 3:30 and 4:00 p.m. Queen relayed the message from Holt about wanting

---

1. On appeal before this court the State alleges, for the first time, that Holt's appeal is barred by his nine-year delay in seeking post-conviction relief. Because we affirm Holt's conviction, we do not address this issue.

drugs. Pitts said that Holt would have to wait because he was going out.

Meanwhile, Holt left McCoy's apartment around 5:00 p.m. and arrived at Queen's door with Kimball, a friend. Holt said they were going to see Pitts but he did not say why. Henderson Howard, a friend who arrived at Queen's house, was paid $20 to drive Holt, Kimball, and Queen to the Red Roof Inn at Holt's direction. Howard parked behind a trailer in a lot adjacent to the hotel and Holt, Kimball, and Queen went into the hotel.

Queen approached room 121 by herself with Holt and Kimball standing several doors down. After Pitts answered the door for Queen, Holt came in behind her brandishing a gun and demanding "[w]here my sh*t at." From behind the bathroom door where she had hidden, Domino heard a male, whom Pitts referred to as "Shorty," order "baby" to search for other people in the room and a female respond "[n]o I don't see her."[2] Domino heard the man order Pitts to get on the floor and threaten, "I'm going to show you what a cold-blooded killer can do. Get on the floor m* * * * * f* * * * *. I'm going to pop you."

According to Domino and Queen, Pitts gave Holt crack cocaine and $200. Holt demanded the rest of his "sh*t," but Pitts said that June had it. Holt threatened, "[w]hen I'm through with your ass I'm going to get June, too." Holt ordered Queen to gather money and jewelry from the room and go back to the car. She was about five steps from the room when she heard gunshots and turned around. Holt, who was standing in the doorway, yelled at her to go back to the car. When she got to the car, she told Kimball and Howard that she thought Holt had "popped" Pitts. Holt returned to the car and ordered How-

ard to get on the freeway. They later got off the freeway and stopped at two garbage cans where Holt threw a purse, which Queen had taken from the hotel room, and some pagers into the garbage. Holt did not return to McCoy's apartment that night. The following day, Holt returned to the apartment and gave McCoy crack cocaine.

Bruce Bratt was a hotel guest staying at the Red Roof Inn on the same day as the murder. He heard nearby shots and went out onto the balcony of his second floor hotel room. He saw a "shorter" black man running away from the hotel with his right hand inside his coat pocket. At the same time, Brian Johnson was loading business supplies into his car in the lot where Howard parked. He noticed a black man, about 5′10″, casually walk to Howard's car. A few minutes later, he saw a shorter black man "quickly running" to the same car. After the second man got into the car, the vehicle accelerated so fast out of the lot that if it had gone any faster "they'd probably burn rubber on the tires. They pulled out as fast as they could."

The police located Howard and took a tape-recorded statement from him. He confirmed driving Holt, Kimball, and Queen to the Red Roof Inn and that he was paid $20 for the ride. Howard testified that Holt had told him that he needed a ride to the location to pick up some work and money. Holt told him where to park, and Howard stayed in the car. Kimball returned to the car first, then Queen came back, and finally Holt returned. Holt announced that he had shot Pitts in the chest and the head. Howard acknowledged stopping at two garbage cans where Holt threw away various things. Later, Howard recanted most of his statement. He

---

**2.** Holt goes by the name "Shorty."

denied having any knowledge about what had happened to Pitts.

Kimball was never located. The police never found the murder weapon, but a firearms examiner believed it was either a nine-millimeter Smith and Wesson or a Ruger based on the bullets and casings found at the scene. Turner recalled that Pitts had purchased a nine-millimeter Smith and Wesson and had given the gun to Holt. Queen testified that Howard took the gun from Holt, but Howard denied this.

While Holt was in jail awaiting trial, a confidential informant alerted police that Holt had made several phone calls to someone in which he asked for help in killing several of the State's witnesses. Police arrested Takisha Holiday after she visited Holt in jail, and found a note with trial witness names and the words "codes, powder, rat poison, fire bombed, needle, syringe, and cigarette poison." The note also contained witness addresses, two of which had been protected by a confidentiality order since inception of the case. An identical note was found in Holt's jail cell. Holt had held this note against the glass during Holiday's visit so that she could copy it. Holt also tried to solicit two of his cellmates to kill several of the State's witnesses. June, a witness for the State, received a threatening call and two letters, one of which read, "The only thing that saved your bitch ass was the police came bitch. Tell that fat m* * * * * f* * * * * it's personal now."

On the third day of trial, Holt requested to proceed pro se, and his two public defenders began acting as standby counsel.

The jury found Holt guilty as charged, and the court imposed a mandatory life sentence for the first-degree murder conviction.

I.

We first consider Holt's claim that the district court erred by not removing a juror whom Holt argues was biased. Over a weekend recess from trial, there were two attempted break-ins at a juror's home. The first burglary attempt occurred around 5:00 p.m. on Friday. The juror's electricity and phone went dead, he heard someone trying to get in the front door, and saw someone run past a window. He pumped an unloaded rifle, yelled for the intruder to leave, and then heard someone run. The Sheriff, who responded to a 911 call from the juror, said that the electrical company was having problems and that there was something wrong with the phone line. Around 12:30 a.m. the juror heard a car park behind one of his sheds and someone trying to get in again. He did not see anyone outside, but the Sheriff came back and noticed footprints.

On the following Monday, the juror notified a jury attendant of these events and the district court held an in-chambers *Schwartz*[3] hearing to question the juror. The court asked if the juror believed the burglaries were "an isolated incident" and the juror responded, "[y]eah ... I've lived there as long as I can remember, and nothing ever [happened] before." The juror was not sure if the event was "totally isolated," and it worried him that someone came back a second time at night. He "really couldn't say" and was "not sure" if the incident related to the case.

---

**3.** Minnesota Rule of Criminal Procedure 26.03, subd. 9, provides for the examination of a juror, out of the presence of the other jurors, about the juror's exposure to material that raises serious questions of possible prejudice. Such a hearing is commonly referred to as a *Schwartz* hearing. *See Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 328, 104 N.W.2d 301, 303 (1960).

The juror believed he could remain "fair and impartial and objective" and understood that his experience was not evidence in the case. The judge concluded that the attempted burglaries were "a coincidence" and found "no indication that [the juror could not] continue to be fair and impartial." Later that same day, the jury heard testimony from one of Holt's cellmates, Andrew Fields, that Holt asked him to murder Queen and Turner, and was given a copy of the note found in Holt's jail cell listing codes, names, and methods to kill witnesses.

Holt asks this court to conclude that the juror should have been excused when these events came to light in the middle of trial and, further, the court should have made use of an alternate juror. Holt asks us to adopt the doctrine of implied bias and presume as a matter of law that the events at the juror's home rendered the juror incapable of being impartial notwithstanding the juror's belief he could be fair and impartial. Holt concedes that this court has never adopted this doctrine; we discussed the doctrine in a recent case without expressly rejecting or adopting it. *State v. Brown,* 732 N.W.2d 625, 629 n. 2 (Minn.2007).

Other jurisdictions have found implied bias in " 'extreme situations where the prospective juror is connected to the litigation at issue in such a way that is highly unlikely that he or she could act impartially during deliberations.' " *Id.* (quoting *Hunley v. Godinez,* 975 F.2d 316, 319 (7th Cir.1992)). A juror with implied bias cannot be rehabilitated through further questioning. *Id.* (citing *People v. Lefebre,* 5 P.3d 295, 300 (Colo.2000)). They must be excused notwithstanding their claim of impartiality. *See* 6 Wayne LaFave, et al., *Criminal Procedure* § 22.3(c) (3d ed.2007); *Lefebre,* 5 P.3d at 300. Permitting a biased juror to serve undermines the basic

" 'structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review.' " *State v. Logan,* 535 N.W.2d 320, 324 (Minn.1995) (quoting *Vasquez v. Hillery,* 474 U.S. 254, 263–64, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)).

■ Holt argues that the facts in this case parallel the facts in *Hunley,* where the Seventh Circuit concluded that sequestered jurors in a burglary-murder case should have been disqualified for implied bias when, during the trial, four of the jurors had their hotel rooms burglarized. All of the jurors were aware of the burglary and expressed concern over the incident. 975 F.2d at 317–20. However, being the victim of a crime does not, standing alone, create "preconceived bias in the mind of the prospective juror." *State v. Roan,* 532 N.W.2d 563, 568 (Minn.1995). The facts in *Hunley* were significant because *all* of the jurors in that case were aware of the burglary and expressed concern over the incident, and the jury was deliberating on a case of burglary and murder with a fact pattern that was strikingly similar to the burglary of their hotel rooms. In contrast, in this case, only one juror was a victim of an attempted burglary and the crime was entirely different from the crime with which Holt was charged. Further, despite Holt's argument to the contrary, there was no connection established between Holt and the attempted burglary at the juror's home, and it reasonably appeared to the district court judge that it was merely a coincidence. The facts of this case do not present the "extreme" situation where the juror is " 'connected to the litigation at issue in such a way that is highly unlikely that he or she could act impartially during deliberations.' " *Brown,* 732 N.W.2d at 629 n. 2 (quoting *Hunley,* 975 F.2d at 319). The juror was confident about being able to be fair and impartial despite the unsettling

events of the weekend. Because no actual bias on the part of the juror was established, it was proper for the juror to continue his service on the case.

## II.

■ Holt claims his convictions must be reversed because the district court violated his constitutional right to self-representation by excluding him from the mid-trial in-chambers *Schwartz* hearing. Holt asserts there was no legitimate reason to conduct the hearing in the judge's chambers and further that the presence of his standby counsel at the hearing did not vindicate his right to represent himself.

Holt was represented at trial by two public defenders. On the third day of testimony, Holt elected to proceed pro se. The court advised Holt of the dangers and disadvantages of self-representation and addressed the security concerns implicated by self-representation in his case. Specifically, Holt would not be permitted to move about the courtroom or approach witnesses; any exhibits would be shuttled between Holt and the witnesses; Holt would not be permitted to attend bench or in-chambers conferences, the substance of which would be placed on the record; standby counsel could attend those conferences if authorized by Holt; and his final argument would be made from a restricted place approved by the court. The court explained that these restrictions were for safety reasons due to the nature of the case, threats to kill witnesses, and a pending charge of conspiracy to tamper with witnesses.[4]

Holt persisted in his request to represent himself. Consequently, following a comprehensive waiver-of-counsel inquiry, the court discharged Holt's two attorneys and allowed them to proceed as standby counsel. When asked if he wanted standby counsel to participate in bench and in-chambers conferences, Holt responded that he did. Throughout the remainder of trial, Holt cross-examined numerous witnesses, consulted with standby counsel 292 times, and gave his own closing argument. The record reflects at least one objection made by Holt after his standby counsel attended a bench conference (and presumably communicated the substance of the conference to Holt). The record further reflects three additional bench conferences and four in-chambers conferences attended by standby counsel. Holt did not object to his standby counsel attending these conferences nor did he object to the court's ground rules about the procedures for bench and in-chambers conferences.

■ It is well recognized that an accused enjoys a constitutional right to represent himself. Under the Sixth Amendment, a defendant has the right to conduct his own defense, provided that he "voluntarily and intelligently elects to do so." *Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This right "plainly encompasses certain specific rights ... to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *McKaskle v. Wiggins,* 465 U.S. 168, 174, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Because self-representation "is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or

---

4. Before the jury was impaneled and sworn and before Holt had asserted his right of self-representation, the court issued an order restricting Holt's telephone privileges and access to other prisoners on information that Holt was soliciting people to kill witnesses.

denied; its deprivation cannot be harmless." *Id.* at 177 n. 8, 104 S.Ct. 944.

■■■■ "In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way." *Id.* at 177, 104 S.Ct. 944. *See also United States v. Mills,* 895 F.2d 897, 905 (2d Cir.1990); *State v. Davenport,* 177 N.J. 288, 827 A.2d 1063, 1074 (2003). To that end, standby counsel's unsolicited participation is limited:

> First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.
>
> Second, the participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself.

*McKaskle,* 465 U.S. at 178, 104 S.Ct. 944 (emphasis in original).

In this case, the presence of standby counsel at the *Schwartz* hearing in chambers did not hamper Holt's control over his own case. First, Holt never objected to the help given by standby counsel. Indeed, the record indicates that he solicited and welcomed the presence of his standby attorneys at the bench and chambers conferences. Second, it is clear that standby counsel never participated over the defendant's objection. In fact, he consulted with standby counsel 292 times during the trial. The record does not support a conclusion that standby counsel interfered with Holt's tactical decisions, controlled the questioning of witnesses, or spoke instead of Holt on any matter of importance.

Holt makes much of the fact that the record is silent as to whether he was ever informed of the substance of the in-chambers *Schwartz* hearing. He asserts that he was prejudiced by a lack of information about the hearing because had he been present for the juror's account of the incident at his home, Holt "would have moved to disqualify the juror" or "[a]t the very least, Holt may have questioned the juror about whether the prosecution's plot-to-kill evidence would have impacted the juror's ability to remain impartial." Yet, the record is clear that Holt was aware of an in-chambers meeting and that his standby attorney was attending the meeting, which was consistent with the established ground rules.

If his claim in this postconviction appeal is that he was never told about the purpose of the meeting, or given a chance after the meeting to note an objection, then his remedy was to request an evidentiary hearing where these issues could be sorted out. Instead, he filed a postconviction petition and never alleged in the petition that he was uninformed, and on appeal from the denial of his petition, he now asks us to presume that he was uninformed. On this record, we will not presume Holt was uninformed. Nor do we accept the implicit invitation to adopt a rule that would require standby counsel to make a record of each consultation with a pro se litigant. It is enough to say that where the record reflects that Holt knew that an in-chambers meeting was being held at his exclusion, and there is circumstantial evidence that standby counsel informed Holt of the substance of other bench and chambers conferences, we will presume that he was informed. He waived his right to be present at in-chambers proceedings when

he specifically requested that standby counsel handle such proceedings on his behalf.

Even when a defendant has actual control over his case, presenting it in his own way, *Faretta* may be violated if unsolicited participation of standby counsel "destroy[s] the jury's perception that the defendant is representing himself." *McKaskle*, 465 U.S. at 178, 104 S.Ct. 944; *see also Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 162, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000). Holt argues that his exclusion from the *Schwartz* hearing "affected the [questioned] juror's perception of Holt's self-representation." But the district court had previously informed the jury that Holt's attorneys had been discharged and were "no longer representing him," explaining that their role was that of standby counsel, acting in an advisory capacity and not as co-counsel. "Standby counsel are present 'to steer a defendant through the basic procedures of trial' and 'to relieve the judge of the need to explain and enforce basic rules of [the] courtroom.'" *State v. Richards*, 552 N.W.2d 197, 206 (Minn.1996) (quoting *McKaskle*, 465 U.S. at 184, 104 S.Ct. 944). Their primary purposes are "ensuring the fairness of the criminal justice process, promoting judicial efficiency, and preserving the appearance of judicial impartiality." *State v. Clark*, 722 N.W.2d 460, 468 (Minn.2006) (citing Minn. R.Crim. P. 5.02, subd. 2, cmt.).

The trial record reflects that Holt had full control over his defense: he cross-examined the State's witnesses, made tactical decisions, exercised his right to remain silent, moved for mistrial when his witnesses failed to appear at trial, and conducted his own lengthy closing argument. We have reviewed the entire record and conclude that the trial judge took great care to ensure that Holt had a fair chance to present his case in his own way. Holt's right to self-representation was rigorously protected, and there is no showing that the jury's perception that Holt was representing himself was destroyed.

### III.

We next consider whether excluding Holt from the in-chambers *Schwartz* hearing violated his constitutional right to be present at a critical stage of the trial. Due process affords a defendant the "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Tennessee v. Lane*, 541 U.S. 509, 523, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (quoting *Faretta*, 422 U.S. at 819, n. 15, 95 S.Ct. 2525). The right to be present is broader under the Minnesota Rules of Criminal Procedure than under the United States Constitution. *State v. Ware*, 498 N.W.2d 454, 457 (Minn. 1993) (citing *State v. Thompson*, 430 N.W.2d 151, 152 (Minn.1988)); Minn. R.Crim. P. 26.03, subd. 1(1).

The examination of a juror for bias should be on the record and in the presence of counsel and the defendant. *State v. McGath*, 370 N.W.2d 882, 886 (Minn.1985). Specifically, a defendant should be present at *Schwartz* hearings. *See State v. Powers*, 654 N.W.2d 667, 681 (Minn.2003). But a defendant's right to be present is not absolute and can be restricted for the safety of those present in the courtroom. *See State v. Richards*, 495 N.W.2d 187, 196 (Minn.1992). A defendant's absence "is not ground for a new trial if he was not prejudiced," *McGath*, 370 N.W.2d at 886 (citing *Kelsey v. State*, 298 Minn. 531, 532, 214 N.W.2d 236, 237 (1974)), and such an absence will be reviewed for harmless error. *State v. Bouwman*, 354 N.W.2d 1, 8 (Minn.1984).

In *Kelsey*, after the jury was sworn, the trial court, in the presence of counsel,

talked to a juror on the record in chambers while the defendant was not present. *Kelsey*, 298 Minn. at 532, 214 N.W.2d at 237. The juror related that he had not remembered an incident about 1–1/2 or 2 years earlier where a coworker had been killed by an intruder. *Id.* The judge had questioned the entire jury panel the day before about friendships with victims of crimes of violence. *Id.* The juror felt he could be fair, and he was allowed to continue his service. *Id.* We concluded that although the defendant should have been present, he was not prejudiced where he could not have exercised a peremptory challenge because the jury panel had already been sworn. *Id.* "More important, there was no basis whatever for believing that there was any actual bias on the juror's part justifying the granting of a motion for a mistrial, had such a motion been made." *Id.*

Even if we assume that Holt had a right to be present at the *Schwartz* hearing, he was not prejudiced because the questioned juror was not biased. As discussed above, the judge questioned the juror during the *Schwartz* hearing and concluded that the juror could be fair. As in *Kelsey*, where the juror was found by the court to not be biased, Holt was not prejudiced by not being present. *See also Bouwman*, 354 N.W.2d at 8 (holding that defendant's absence from an in-chambers conference was harmless error because his absence "did not prejudice his case"). Therefore, we conclude that any error in excluding Holt was harmless beyond a reasonable doubt.

## IV.

■ We next consider whether the district court erred by admitting evidence of Holt's witness tampering and by failing to instruct the jury on the specific purpose of "consciousness of guilt" evidence.[5] The State introduced testimony from Holt's cellmate, Andrew Fields, that Holt asked him to murder Queen and to "pop" Turner. Also, a document seized from Holt's cell was introduced, which contained witness names and addresses, and the words "codes, powder, rat poison, fire bombed, needle, syringe, and cigarette poison." Prior to the admission of this evidence, standby counsel objected that it was more prejudicial than probative. The State countered that the evidence demonstrated Holt's "consciousness of guilt."

■ "[E]videntiary and procedural rulings generally rest within the district court's discretion and will not be reversed absent a clear abuse of discretion." *State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990). "[E]vidence of threats to witnesses may be relevant in showing consciousness of guilt." *State v. Harris*, 521 N.W.2d 348, 353 (Minn.1994). Such evidence is "not admissible if it is characterized as tending to show defendant's propensity or disposition to commit the crime charged." *Id.*

In *Harris* the trial court failed to provide cautionary instructions relating to death threats against three potential witnesses, and there was no attempt to limit the amount of evidence about threats to witnesses when such threats were not linked to the defendant. *Harris*, 521

---

**5.** Appellant's motion to strike portions of respondent's appendix and brief that reference a criminal complaint against appellant alleging first-degree witness tampering is granted because the complaint is outside the record on appeal. *See* Minn. R. Civ.App. P. 110.01 (stating that the record on appeal consists of papers filed in the district court, exhibits, and transcripts of the proceeding); *Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn.1988) (stating that "[a]n appellate court may not base its decision on matters outside the record on appeal.").

N.W.2d at 351–52. We reversed the conviction and ordered a new trial.

In Holt's case, there was a direct link established between Holt and the threats to witnesses, and the district .court limited the amount of evidence introduced. The district court considered arguments from both parties, then ruled that the State was not improperly exploiting the evidence and was avoiding "creating the inference that the defendant is a bad character." The court concluded that the proffered evidence of direct threats to witnesses by the defendant was relevant in showing consciousness of guilt and that the danger of any undue prejudice was far outweighed by the probative value of the evidence.

Before allowing the State to introduce the evidence, the court provided the following cautionary instruction:

This evidence is being offered for the limited purpose of assisting you in determining whether the defendant committed those acts with which he is charged in the indictment that I had read to you. The defendant is not being tried for and may · not be convicted of any offense other than the offense charged in the indictment. You are instructed specifically that you are not to convict the defendant on the basis of any occurrence between February 12, 1998, and February 19, 1998. To do so might result in unjust double punishment.

When offering the note as evidence, the court instructed the jury to rely on this same instruction. Holt did not object to either instruction.

▮▮▮▮ Holt argues for the first time on appeal that the jury should have been instructed that the evidence was only offered to show defendant's "consciousness of guilt." Even if evidence of threats is admissible, the court must "provide safeguards including cautionary instructions to prevent the evidence from being misused."

*Harris,* 521 N.W.2d at 353 (citing *State v. Wilford,* 408 N.W.2d 577, 580 (Minn.1987)). The court has discretion to fashion appropriate safeguards when admitting "consciousness of guilt" evidence. *McArthur,* 730 N.W.2d at 52.

In *McArthur* we recognized that it is difficult to fashion a cautionary instruction when evidence of threats is properly admitted. *See id.* We left that task to the discretion of the district courts, "trusting them to make sound decisions about the admissibility of evidence of witnesses' fear and to fashion appropriate safeguards in the event such evidence is admitted." *Id.* The district court in this case properly weighed the probative value of the evidence against the danger of unfair prejudice and fashioned a cautionary instruction for the jury. It was not an abuse of discretion to admit the evidence nor was it an abuse of discretion to fail to incorporate the term "consciousness of guilt" in the cautionary instruction. .

### V.

▮▮▮ Next Holt contends that the district court erred by admitting an alleged accomplice's statement as substantive evidence. When police arrested Howard on May 30, 1997, he provided Detective Boudreau with a taped unsworn statement in which he said Holt admitted, "I popped him in the head, and I tried to pop him in the heart, but he covered up his heart. I popped him a couple times. I tried to make him look at me." He stated that Holt had a gun in the car after they left the hotel. At trial, Howard denied most of the events in his recorded statement. Detective Boudreau took the witness stand and testified about the contents of the statement. At the close of the case, the trial judge instructed the jury: "In the case of Henderson Harris Howard, evidence of proper statements and testimony

he gave concerning this case may be—may also be considered by you for all purposes."

■ A determination that a statement meets the foundational requirements of a hearsay exception is reviewed for an abuse of discretion. *State v. Buggs*, 581 N.W.2d 329, 334 (Minn.1998). "A defendant claiming error in the district court's reception of evidence has the burden of showing both the error and the prejudice resulting from the error." *State v. Loebach*, 310 N.W.2d 58, 64 (Minn.1981).

■ Minnesota Rule of Evidence 803(24) (2004) (amended Sept. 1, 2006)[6] provides a "catchall" exception that admits hearsay evidence when the declarant testifies and there are "circumstantial guarantees of trustworthiness equivalent" to those found within other specific hearsay exceptions. *State v. Ortlepp*, 363 N.W.2d 39, 44 (Minn.1985). In *Ortlepp* the court considered four factors to conclude that testimony was sufficiently trustworthy: (1) there was no confrontation problem as the declarant testified, admitted making the prior statement, and was available for cross-examination by the defense counsel; (2) as the declarant admitted making the statement and the statement was taped, there was no real dispute about what the declarant had said; (3) the statement was against the declarant's penal interest, which increased its reliability; and (4) the statement was consistent with the state's other evidence that "pointed strongly toward both" the defendant's and the declarant's guilt. *Id.* While *Ortlepp* provides helpful guidance, the ultimate test remains whether the statement contains sufficient "circumstantial guarantees of trustworthiness" so as to be admissible. *State v. Robinson*, 718 N.W.2d 400, 408 (Minn. 2006).

When we apply the *Ortlepp* factors to the statement, we conclude that the statement contains sufficient "circumstantial guarantees of trustworthiness" so as to be admissible. Howard testified and was subject to cross-examination. Howard admitted to making the statement. The statement was against Howard's penal interest. Although there is no evidence that Howard knew Holt was planning to murder Pitts, Howard could have been charged with aiding an offender after the fact for his role in driving the getaway car and stopping to dispose of items in two garbage cans. Finally, Howard's statement to Detective Boudreau was consistent with the State's other evidence. We conclude that the district court did not abuse its discretion when it admitted Howard's statement as substantive evidence.

## VI.

■ Holt contends that the district court erred in denying the defense request for a jury instruction for corroboration of accomplice testimony, claiming that Queen and Howard were Holt's accomplices. Holt's standby counsel requested the court give the following instruction:

> You cannot find the defendant guilty of a crime on the testimony of a person who could be charged with that crime, unless that testimony is corroborated by other evidence that tends to convict the defendant of the crime. Such a person who could be charged for the same crime is called an accomplice.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.18 (5th ed.2006). Holt's standby counsel argued that the jury should decide as a question of fact whether or not Queen and Howard were accomplices. "If the facts of the case are undis-

6. Minn. R. Evid. 803(24) has been replaced with Minn. R. Evid. 807.

puted and there is only one inference to be drawn as to whether the witness is an accomplice, the court should make the determination [as a matter of law]; however 'if the evidence is disputed or susceptible to different interpretations, then the question ... is one of fact for the jury.' " *State v. Lee*, 683 N.W.2d 309, 316 (Minn.2004) (quoting *State v. Flournoy*, 535 N.W.2d 354, 359 (Minn.1995)). The district court declined to give the accomplice jury instruction, finding no basis in the record to find that either Queen or Howard were accomplices.

■■■ We assume without deciding that Queen and Howard were accomplices of Holt, and that the district court erred in refusing to give an accomplice instruction; we nevertheless conclude that any error was harmless. To determine if failure to provide an accomplice instruction was harmless error, we consider "whether the accomplice testified in exchange for leniency, whether the accomplice's testimony was emphasized in the prosecution's closing argument, [ ] whether the accomplice's testimony was corroborated by significant evidence," and whether a general instruction on witness credibility was given. *State v. Jackson*, 726 N.W.2d 454, 461 (Minn.2007) (citing *State v. Gail*, 713 N.W.2d 851, 864 (Minn.2006), and *State v. Lee*, 683 N.W.2d 309, 317 (Minn.2004)).

Queen and Howard did not testify in exchange for leniency, the prosecutor did not emphasize their testimony in his closing argument, and the court provided a general witness credibility instruction. There was strong corroboration of the testimony of Queen and Howard. The State presented two bystander witnesses, Bratt and Johnson, who placed Holt at the Red Roof Inn the day of the murder. The State established motive and introduced evidence that Holt fled from the police. The State presented evidence that Holt

attempted to have the State's witnesses killed so they could not testify at trial. Domino, who was hiding in the adjoining bathroom when the victim was shot, testified that the victim repeatedly referred to Holt by name as he was being shot. Based on the strong corroborating evidence at trial, we conclude that any error in the district court's refusal to give the jury an accomplice corroboration instruction was harmless beyond a reasonable doubt.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. The United States Supreme Court recognized a defendant's constitutional right to self-representation in *Faretta v. California*, 422 U.S. 806, 832, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). And we have held that a defendant's right to counsel includes "a constitutional right to conduct his defense in person without assistance of counsel." *State v. Huber*, 275 Minn. 475, 482, 148 N.W.2d 137, 142 (1967). A criminal defendant also has a constitutional right to be present at all critical stages of a trial. *U.S. v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). While we said in *State v. Richards*, 495 N.W.2d 187, 196 (Minn.1992), that a "defendant's right to be present at all stages of the trial is not so absolute as to require jeopardizing the safety of those present in the courtroom," a trial court may use only those procedures reasonably necessary to maintain order and security. Minn. R.Crim. P. 26.03, subd. 2(c) (describing procedures for the use of physical restraint). Less restrictive available alternatives must also be considered, especially when a defendant's rights are at stake. *See State v. Mahkuk*, 736 N.W.2d 675, 684–85 (Minn.2007) (public

trials); *State v. Chambers*, 589 N.W.2d 466, 475 (Minn.1999) (physical restraints).[1]

Here, the trial court conditioned Holt's right to self-representation on his exclusion from proceedings in chambers. Coupled with the trial court's decision to hold proceedings, including a *Schwartz* hearing, in chambers and its subsequent exclusion of Holt from those proceedings, the trial court effectively violated Holt's constitutional right to represent himself and his right to be present at all critical stages of trial.

Holt requested during trial that he be allowed to proceed pro se with the assistance of standby counsel. The trial court conducted a colloquy with Holt, including a comprehensive examination as to Holt's understanding of the nature of the charges against him, the possible punishments, and the dangers of self-representation. *See State v. Camacho*, 561 N.W.2d 160, 173 (Minn.1997). In addition, the following discussion took place:

> The Court: Do you understand further that you will not be allowed to move about the courtroom? ... that you will not be allowed to approach the witness stand ... ?
>
> . . . .
>
> In addition, you will not be permitted to approach the bench for a bench conference. Only standby counsel, should you authorize it, will. You will not be permitted to come back into chambers or to a conference room when all the other attorneys would normally confer with the Court.
>
> Do you understand that?
>
> . . . .

> Everything will be put on the record, whether it's done in the court, in chambers, or in a conference room. It will be on the record.
>
> [Holt]: Will I have any kind of representation there at all?
>
> The Court: Standby counsel will be there if you authorize it. In addition, I will tell you that I am restricting your movement for the safety of witnesses, the jury, the Court, counsel, all counsel, and all of the court personnel. And the reason I'm doing that is because of the nature of the case, number one; because of the probable cause to believe that threats have been made to one or more witnesses, two; three, because probable cause has been found and a complaint has been issued against you for tampering with a witness or conspiracy to tamper with witnesses in the first degree.
>
> . . . .
>
> The Court: Do you wish to represent yourself with them as standby counsel participating at the bench and giving you assistance, standing by but not acting as co-counsel, or do you wish to have them take no part?
>
> [Holt]: No, I wish them to represent me as in approaching the bench, in the judge chambers on issues, and at my table.

The court's opinion today ignores the trial court's error and then attempts to divert attention away from that error by mischaracterizing what took place through its emphasis on Holt's agreement to the trial court's "ground rules." While it appears that the trial court was justified in

---

**1.** The ABA Standards for Criminal Justice state that "[t]he trial judge should endeavor to maintain secure court facilities. In order to protect the dignity and decorum of the courtroom, this should be accomplished in *the least obtrusive and disruptive manner, with an effort*

*made to minimize any adverse impact."* American Bar Association, *Standards for Criminal Justice: Special Functions of the Trial Judge,* Standard 6–3.2 (3d ed.2000) (emphasis added).

restricting Holt's movements in the courtroom based on safety and security concerns, the problem is that the trial court failed to utilize the least-restrictive alternatives available to ensure safety and security. Had the trial court simply held the *Schwartz* hearing and the in-chambers conferences with counsel in the courtroom without the jury present, the court's safety and security concerns would have been accommodated without any violation of Holt's right to self-representation or his right to be present at every critical stage of trial. But the trial court's "ground rules" offered Holt a pair of Hobson's choices. The trial court forced Holt to choose between forgoing completely his constitutional right of self-representation and accepting the limitations on his right to be present at critical stages of trial in order to receive a substantively limited right to self-representation. In the end, even that choice was an illusion because the trial court violated Holt's right to self-representation by forcing him to choose between having no representation during in-chambers conferences and having representation by standby counsel. The Supreme Court has found it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (reversing a judgment when a defendant was forced to choose between asserting a Fourth Amendment claim and his Fifth Amendment privilege against self-incrimination). While constraints may be placed on voluntary decisions of waiver, "[a] criminal defendant may be asked to choose between waiver and another course of action [only] as long as the choice presented to him is not constitutionally offensive." *U.S. v. Robinson*, 913 F.2d 712, 715 (9th Cir.1990) (citing *U.S. v. Moya–Gomez*, 860 F.2d 706, 739 (7th Cir.1988)) (determining whether a waiver of counsel was volun-

tary). It is even less tolerable when the right granted by the court is limited to the point of constitutional infirmity. Here, I believe that the trial court's "ground rules" were constitutionally offensive, and Holt's acceptance of the limitations cannot be considered a valid waiver.

The trial court does not explain and, on the record presented, I do not understand why the trial court's safety concerns required the *Schwartz* hearing and some conferences with counsel to be held in chambers with Holt absent. The record suggests that such a limitation was not required because, on some occasions, the trial court excused the jury from the courtroom in order to confer in the courtroom with the State, Holt, and standby counsel all present.

## I.

The constitutional right to self-representation "is either respected or denied; its deprivation cannot be harmless." *McKaskle v. Wiggins*, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Thus, the right to self-representation is not subject to harmless error analysis. *Id.* The trial court may have given Holt his right to self-representation in name, but, by arbitrarily and unnecessarily excluding Holt from the *Schwartz* hearing and in-chambers conferences, the court forced Holt to accept representation by standby counsel alone at those proceedings. As a result, Holt was denied his Sixth Amendment right to self-representation and reversal is required. *See State v. Richards*, 456 N.W.2d 260, 266 (Minn.1990).

We have acknowledged that "the role of standby counsel is fundamentally different from the role of counsel generally. When a lawyer is acting as standby counsel, the defendant's other rights occasionally intervene to *prevent* the standby counsel from acting as would be expected if he or she

were counsel for the defendant." *State v. Richards*, 552 N.W.2d 197, 207 (Minn.1996) (emphasis in original). When standby counsel participates outside the jury's presence, "the *pro se* defendant is entitled to preserve actual control over the case he chooses to present." *McKaskle v. Wiggins*, 465 U.S. 168, 178, 104 S.Ct. 944, 79 L.Ed.2d 122 (describing this standard as the "core of the *Faretta* right"). A trial court judge "must be considered capable of differentiating the claims presented by a *pro se* defendant from those presented by standby counsel." *Id.* at 179, 104 S.Ct. 944. Further, the pro se defendant must be "allowed to address the court freely on his own behalf and ... disagreements between counsel and the *pro se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel." *Id.* If standby counsel is effectively allowed "to make or substantially interfere with any significant tactical decisions, ... or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded." *Id.* at 178, 104 S.Ct. 944.

Obviously, on this record, Holt's right to self-representation was violated because he was not present at the *Schwartz* hearing and the in-chambers conferences held between the trial court, standby counsel, and counsel for the State. The Tenth Circuit concluded that a pro se defendant's *Faretta* rights were violated when a trial court barred him from 30 bench conferences while allowing standby counsel to appear on his behalf. *U.S. v. McDermott*, 64 F.3d 1448, 1454 (10th Cir.1995) (finding that standby counsel spoke instead of the defendant on matters of importance and interfered with significant tactical decisions). The Second Circuit found that, although a defendant was excluded from sidebar conferences, there was no *Faretta* violation, partly because the defendant was present for all legal arguments made by standby

counsel outside the presence of the jury. *U.S. v. Mills*, 895 F.2d 897, 905 (2d Cir. 1990). And the Ninth Circuit found that when a chambers conference "involved two issues with undoubted tactical importance ... [and] involved discussions that ... could not have been accurately predicted or rehearsed in advance, [the defendant]'s exclusion resulted in a complete silencing of [the defendant]'s voice on the matters." *Frantz v. Hazey*, 533 F.3d 724, 742 (9th Cir.2008) (involving the admissibility of a 911 tape and the response to a jury's request for the tape).

By holding the *Schwartz* hearing and the conferences in chambers instead of in the open courtroom where Holt could have been present, the trial court denied Holt an opportunity to address the court freely on his own behalf. The trial court could not have differentiated between Holt's claims and those of standby counsel. Standby counsel for Holt was rarely informed about the nature of these conferences until after they began, so Holt had no chance to give standby counsel any instructions for the hearing. By excluding Holt, the trial court forced standby counsel to interfere with Holt's representation on significant tactical decisions and speak instead of Holt on matters of importance. Essentially, whenever the trial court excluded Holt from the proceedings, Holt was forced to give up his *Faretta* right and allow standby counsel to act exactly as she would have acted if she were actual counsel for Holt. Thus, on this record, the trial court's decisions violated Holt's Sixth Amendment right because they denied Holt the right to preserve actual control over the case.

## II.

Due process requires that a criminal defendant be present at all critical stages of a trial. *Kentucky v. Stincer*, 482 U.S.

730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). In Minnesota, a criminal defendant has the right to be present "at every stage of the trial." Minn. R.Crim. P. 26.03, subd. 1(1); *Ford v. State,* 690 N.W.2d 706, 712 (Minn.2005). Here, the trial court denied Holt the right to be present by barring Holt from being in chambers and then holding conferences and the *Schwartz* hearing in those chambers. There can be no question about whether those in-chambers gatherings were stages of Holt's trial. They were. Moreover, the *Schwartz* hearing was, without question, a critical stage of the trial. Again, forcing Holt to accept a limitation on his right to be present in exchange for his right to self-representation is constitutionally offensive.

The court states that Holt suffered no prejudice from the trial court's decision to hold the *Schwartz* hearing in chambers. But *Kelsey v. State,* 298 Minn. 531, 532, 214 N.W.2d 236, 237 (1974), the case cited by the court for its harmless error analysis, predates the promulgation of the Minnesota Rules of Criminal Procedure and does not mention the "harmless beyond a reasonable doubt" standard applicable to the denial of the constitutional right to be present. *See State v. Bouwman,* 354 N.W.2d 1, 8 (Minn.1984). In *State v. Grey,* 256 N.W.2d 74, 77 (Minn. 1977), we found that a defendant's absence from a pretrial suppression hearing was harmful error because "it [was] impossible on this record to determine what contribution or assistance to counsel defendant could have rendered had he been present to hear the oral testimony of [the testifying officer]." Not only are the facts in this case similar to *Grey,* Holt was a pro se defendant, and the denial of his right to be present facilitated the violation of his right to self-representation. On this record, Holt's exclusion from the *Schwartz* hearing was not harmless beyond a reasonable doubt.

I would reverse Holt's convictions and remand for a new trial.

ANDERSON, Paul H., Justice (dissenting).

I join in the dissent of Justice Page.